## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>MAHMOUD REZA BANKI,<br><br>          Defendant. | No. _____ |

## MEMORANDUM IN SUPPORT OF DEFENDANT MAHMOUD REZA BANKI'S APPEAL FROM AN ORDER DENYING PRE-TRIAL RELEASE

### Preliminary Statement

1.      Defendant Mahmoud Reza Banki appeals from an Order entered January 21, 2010, in the United States District Court for the Southern District of New York, by the Honorable John F. Keenan, United States District Judge, denying Mr. Banki's application for bail pending trial.

2.      Mr. Banki is a 33-year old Iranian-born citizen of the United States who has lived continuously in the U.S. since he was eighteen.  Mr. Banki obtained college and Ph.D. degrees here, at U.C. Berkeley and Princeton, and his entire work history is also here in the U.S.  While fully recognizing the deference ordinarily due to a determination to release, or detain, a defendant pending trial, we respectfully submit that the District Court committed legal error in ruling that the Government had met its burden of showing that there are no conditions of bail which will reasonably assure

Mr. Banki's attendance at trial. Indeed, even a basic review of the evidence behind the Government's proffer of a "strong" case—which the District Judge erroneously accepted at face value—shows that Mr. Banki has been wrongly arrested and detained. In alleging that Mr. Banki violated Office of Foreign Asset Control ("OFAC") regulations in receiving funds from his family in Iran, the Government has recklessly criminalized conduct on Mr. Banki's part that is entirely innocent. The Government's purported objective of undermining an enemy State does not excuse compliance with procedures and standards that are fundamental to affording individuals due process.

      3.     The five-page Order remanding Mr. Banki pending trial is fatally undermined by the following errors:

- the Order credits the Government's one-word characterization of its case as "strong," when the record reveals that the Government's ability to prove its charges will depend on whether the factfinder accepts the Government's strained interpretation of statements made by Mr. Banki himself during a single interview at John F. Kennedy International Airport in May 2009;

- while twice describing Mr. Banki as a "native of Iran," the Order fails to credit Mr. Banki's considerable ties to the United States, including his U.S. citizenship, his continuous residence in the U.S. for the past 16 years, and the fact that all of his secondary education and work history are in the U.S.;

- the Order ignores that Mr. Banki has known since 2006 of OFAC's inquiry, has traveled extensively and internationally since then, but even after being questioned by immigration agents at JFK Airport last May, always returned to the U.S.;

- the Order instead wrongly focuses on a photocopied flyer advertising false photo IDs and found at Mr. Banki's apartment as proof that Mr. Banki presented a risk of flight, though it was undisputed that the flyer had been obtained by Mr. Banki in his college years and was seized only because it

remained among his belongings;

- the District Judge categorically ruled out the bail condition of home confinement under the guard of a private security service, on the ground that "it's not a process that's going to occur in any of my cases," although that condition of release has been expressly approved by this Court.

4.      In sum, the District Court erred in rejecting the recommendation of Pre-Trial Services that Mr. Banki be granted bail pending trial and concluding instead that Mr. Banki is among the "limited group of offenders" disqualified from obtaining bail pending trial. *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (quoting *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987)). Mr. Banki respectfully submits that the District Court improperly shifted the burden to him of demonstrating that he would not flee, rather than holding the Government to the burden of establishing a serious risk of flight.

5.      Some combination of the conditions of release offered by Mr. Banki also should have been deemed ample to assure Mr. Banki's presence at trial. Mr. Banki offered a personal recognizance bond of up to $1 million, co-signed by up to nine individuals, three of whom are attorneys licensed to practice law in the U.S. Mr. Banki also offered to be confined in his home, under either electronic monitoring conducted by Pre-Trial Services or the watch of a security service, with the costs borne by himself. The characteristics present here—a case founded on a regulatory violation and equivocal evidence, the accused's considerable ties to the U.S., and his demonstrated willingness to contest the charge on the merits—are consistently

3

deemed to support pre-trial release. Conditions of bail comparable to those offered by Mr. Banki have indeed been deemed sufficient in cases involving far more serious charges, risk of flight, and an effective life sentence. *See, e.g.*, *United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009); *United States v. Dreier*, 596 F. Supp. 2d 831 (S.D.N.Y. 2009).

6. The Government has continued to produce significant discovery after the January 22, 2010 discovery deadline set by the District Judge. However it is already apparent that the prosecution of Mr. Banki is a terrible mistake and his detention unjustified. This Court should reverse the District Court's Order and remand the case for a consideration of some combination of the bail conditions offered by Mr. Banki.

## BACKGROUND

**A.** **Mahmoud Reza Banki and the Charges He Faces**

7. Mr. Banki is a 33-year old U.S. citizen who lives in New York City. (Ex. I, 1/21/10 Order, at 2; Ex. B, 1/11/10 Hrg. Tr., at 8:10.) He emigrated to the U.S. from Iran in 1994 and has lived here since then. (Ex. B, at 5:12.) Mr. Banki holds two Bachelor degrees from the University of California, Berkeley, and a Ph.D. in Chemical Engineering from Princeton University. (*Id.* at 4:18-5:3.) Until his arrest, Mr. Banki worked as a Senior Associate at McKinsey & Company. (*Id.* at 4:22-5:7.)

8. Mr. Banki holds both U.S. and Iranian passports, and he has used the latter solely to visit his parents, who also are U.S. citizens but now live in Iran. (*Id.* at

6:16-23.) Mr. Banki has not visited Iran since August 2008, prior to the presidential elections that triggered political unrest there. (Ex. D, 1/15/10 Hrg. Tr., at 8:20-23.)

9.    On January 7, 2010, Mr. Banki was arrested on charges that he knowingly provided money transmitting services to individuals located in Iran, in violation of OFAC regulations. (Ex. A, Indictment, at ¶¶ 7-18.) Government agents confiscated both his U.S. and Iranian passports. (Ex. B, at 6:13-15.)

**B.    The Financial Transactions at Issue**

10.    The Indictment alleges that Mr. Banki helped to manage a "hawala," a money transfer service, by which individuals sent funds to Iran, in violation of OFAC regulations that prohibit the export of goods and services from the U.S. to that country. (Ex. A, at ¶¶ 7-14.) A "hawala" is an informal system that permits the transfer of money, often without the physical movement of funds over borders. (*Id.* at ¶ 10.) The Indictment thus alleges that in a "hawala," "funds are transferred by customers to a hawala operator . . . in one country (here, the United States), and then corresponding funds, less any fees, are disbursed to recipients in another country (here, Iran) by foreign [agents] associated with the U.S.-based [operator]." (*Id.*)

11.    The Indictment alleges that Mr. Banki received $4.7 million in funds, from "foreign and domestic companies and individuals," in his bank account in New York, "*with the understanding* that the funds would, in turn, be disbursed to intended recipients residing in Iran." (*Id.* at ¶ 8 (emphasis added).) The Indictment attributes

5

to Mr. Banki the following single act as evidence that he knowingly transferred the funds received in his account to Iran: telephone calls made by Mr. Banki, upon receipt of funds, to "an Iran-based co-conspirator . . . that the funds had been received." (*Id.* at ¶ 9.) The Indictment alleges that that Iranian co-conspirator, or others, then disbursed funds, less fees, to individuals in Iran. (*Id.* at ¶¶ 9-10.) The Indictment states that Mr. Banki used funds received in his account to purchase an apartment in New York City. (*Id.* at ¶ 11.)

12.     Mr. Banki confirms that he received transfers of funds into his bank account but has explained that those funds came, directly or indirectly, from his own family in Iran. (Ex. B, at 3:19-24.) Mr. Banki's family is partial owner and manager of a pharmaceuticals company in Iran. (Ex. E, 1/19/10 Letter from M. Greenwald to District Court, at 2.) His family sent money *out* of Iran to Mr. Banki using intermediaries, a practice common among Iranians seeking to send their money out of that country. (Ex. G, 1/20/10 Letter from M. Greenwald to District Court, at 1.) Mr. Banki admits that he has used funds sent by his family to invest in real estate property—the New York City apartment in which he lives. (Ex. B, at 3:19-25.) When Mr. Banki *received* money from his family, he informed family members in Iran that funds had arrived and thus that fees could be paid to the brokers who helped Mr. Banki's family send funds to the U.S. (*Id.*)

13.     The Indictment does not allege that merely using a hawala is a crime.

Mr. Banki categorically denies that he knowingly managed, supervised, or directed a money transmitting service by which funds were transferred *to* Iran. (Ex. B, at 3:19-24; Ex. G, at 1.)

## C.    January 11, 2010 Bail Hearing

14.     Mr. Banki's original bail hearing took place on January 11, 2010. The recommendation in the Pre-Trial Services Report was that Mr. Banki be released on bail. (Ex. B, at 2:21-23.) Mr. Banki proposed to the District Court that he be released upon signing a $300,000 personal recognizance bond, co-signed by at least four financially responsible people, all of whom are U.S. citizens. (*Id.* at 2:21-25, 9:15-25.) Mr. Banki offered to further secure the proposed bond with his apartment, valued at $2.5 million. (*Id.* at 2:21-3:1, 9:12-10:2.)[1]

15.     Mr. Banki submitted that he was not a serious flight risk because his passports had been seized, and his home, his friends, and his career were all in the U.S. (*Id.* at 12:19-13:14.) Mr. Banki himself addressed the Court and explained that he had no desire to leave the U.S. for any other country because he "live[d] the American dream," loved the opportunities the U.S. had given him, and "ha[d] every reason to stay in the U.S." (*Id.* at 12:15-18.) Mr. Banki stated that he was innocent and intended to salvage his future and his dignity. (*Id.* at 12:6-13:14.)

---

[1]   In proposing conditions of release, Mr. Banki faced the "Catch-22" that the Government on the basis of the Indictment has obtained orders freezing his bank accounts and placing a *lis pendens* on his residence. (Ex. B, at 14:21-15:2.)

16.     Mr. Banki stated that all funds he had received from Iran were sent by his family. (*Id.* at 3:19-25.) Mr. Banki proffered, without dispute, that since receiving inquiries from OFAC, beginning in 2006, he had hired counsel and responded in writing to OFAC's inquiries. (*Id.* at 4:1-11.) In an excess of caution, he specified on his 2006 tax returns that he had received the funds as gifts. (*Id.* at 4:1-3; Ex. G, at 1.)

17.     The Government argued that Mr. Banki "poses a very significant risk of flight" and had "strong" ties to "his native country of Iran." (Ex. B, at 14:10-16.) Pressed by Judge Keenan on the nature of its proof, the Government stated that "[Mr. Banki] has admitted . . . that he is aware that money was being sent back to Iran, that this was a transfer system. And so we believe that the proof is strong here." (*Id.* at 19:15-20.) The Government also stated that it had "numerous witnesses who say the exact same thing." (*Id.* at 19:20-21.)

18.     The District Court ordered Mr. Banki detained, stating:

> I don't believe there is any combination of circumstances or any single circumstance that will ensure the defendant's presence here. I think there's too much of an incentive to flee. His ties are in Iran not in the United States even though he has been educated in the United States. The application for bail is denied.

(*Id.* at 23:22-24:3.)

19.     The District Court set a trial date of March 22, 2010 and ordered the Government to "make every effort" to make all the discovery available by January 22, 2010. (*Id.* at 26:18-23.)

8

**D.** **The Request for Rehearing and Second Bail Hearing**

20.     On January 13, 2010, Mr. Banki submitted a request for a rehearing based on an offer to propose more restrictive bail measures. (Ex. C, 1/13/10 Letter from M. Greenwald to District Court.)

21.     Judge Keenan convened a re-hearing, on January 15, 2010, at which Mr. Banki proposed increasing the amount of the personal recognizance bond to $1 million and offered six (and up to nine) financially responsible co-signers, all of whom are U.S. citizens and three of whom are attorneys. (Ex. D, 1/15/10 Hrg. Tr., at 5:1-12.) Mr. Banki again offered his apartment as security. (*Id.* at 5:22-6:5.)

22.     Mr. Banki submitted that he would agree to any bail condition that would alleviate the Court's concern about risk of flight. Mr. Banki proposed ankle bracelet monitoring and strict home confinement, or even supervision by private security guards answerable to the Court and funded by himself. (*Id.* at 6:6-22.) Judge Keenan categorically rejected the proposal to use private security, stating:

> I'm not going to order self-paid guards. . . . I don't like that whole process. And I have never done it. And I'm not going to do it in this case. This idea of a defendant hiring his own guards, I know it has been done, but it's not a process that is going to occur in any of my cases.

(*Id.* at 18:18-25.)

23.     Mr. Banki also challenged the Government's reliance on a photocopied flyer that it had produced for the first time that day. The flyer had been seized from Mr. Banki's apartment and advertised a company that provided fake forms of

9

Canadian and U.S. identification. (*Id.* at 11:8-12:21.) Mr. Banki explained that the pamphlet had been given to him on the Purdue University campus in Indiana in 1994 and had been seized by agents only because it had remained among his belongings since that time. (*Id.* at 11:15-21.)

24.     Mr. Banki addressed the Government's assertion that Mr. Banki would find Iran to be a safe haven because his family was "very politically connected" there. (Ex B, at 20:20-25.) Mr. Banki noted that his grandfather, Ayatollah Taleghani, had publicly broken with Ayatollah Khomeini shortly after the 1979 Revolution, died a few months later, and remains a figure strongly associated with the current opposition movement in Iran. (*Id.* at 7:1-3, 19:7-10.) Mr. Banki offered to provide the Court with translations of Farsi-language materials documenting the hostility of the current regime in Iran to his family. (*Id.* at 19:16-20:10.) Mr. Banki explained that it was in part from fear that the Iranian regime would confiscate Mr. Banki's family's business interests that his family members were sending money to the U.S. (*Id.* at 19:10-19.)

25.     Judge Keenan did not render a ruling at the hearing. Instead, he ordered defense counsel to prepare and submit translations of the Farsi-language articles to which counsel had referred during the argument. (*Id.* at 20:11-19.)

**E.     The Parties' Post-Hearing Submissions**

27.     On January 19, 2010, Mr. Banki submitted the documents translated from Farsi that established his family's long-standing opposition to the Iranian regime. (Ex.

E, 1/19/10 Letter from M. Greenwald to Judge Keenan.) Mr. Banki also provided translations of Iranian court documents illustrating the regime's attempts to seize assets belonging to the sizeable family business. (*Id.*)

28.  In responding, the Government stated that the "new documents" established, "[a]t best, . . . that the defendant's family is a prominent one with many supporters in their country." (Ex. F, 1/20/10 Letter from D. Perry to District Court, at 1.) The Government also maintained that the fact that many of Mr. Banki's family members resided in Iran, or had returned there, showed that Mr. Banki would not be "unwelcome" in Iran. (*Id.*, at 3.)

29.  The Government attempted to bolster its assertion that its case was strong. It represented that it would rely at trial on admissions of Mr. Banki, and testimony of witnesses, that "money was not only flowing to Banki from Iran, but was being remitted back to Iran in . . . a hawala." (*Id.*, at 4.)

30.  The Government first disclosed the Memorandum of Interview ("Memorandum") which in its view memorializes Mr. Banki's "admissions," on January 20, 2010. The Memorandum summarizes, in a less than a single page, an interview of Mr. Banki conducted by agents of the Immigration and Customs Enforcement ("ICE") on May 6, 2009. (Ex. H, 1/20/10 Second Letter from D. Perry to District Court.) The Memorandum was prepared twelve days after the interview was held. (Ex. J, Report of Investigation dated May 18, 2009, at 1.) The portion of

11

the Memorandum relating to Mr. Banki's purported admission of knowledge that funds were being routed to Iran states:

> When asked why the money was deposited into his account, BANKI stated that people would deposit money into his account, which would be used in his real estate investment. BANKI stated the real estate investment was his condo on 135 West 4th Street.... BANKI also stated that most of these entities and individuals were familiar with his cousin Ali ALAIE, whom [sic] resides in Iran. BANKI stated he would inform ALAIE the money was in the account, the money present in BANKI's account would be used in the real estate investment in New York and ALAIE would pay out the recipient of the money transfer in Iran. BANKI stated that they used this method because it was the only way for people to get money to Iran and it was a benefit to ALAIE to invest the money outside of Iran.

(*Id.*)[2]

31. Most fundamentally, the production of the Memorandum makes clear that the strength of the Government's case will rest on a swearing match between Mr. Banki and the agent or agents (as yet unidentified) who interviewed him. The Government had claimed at the first bail hearing that there were "numerous witnesses" who said "the exact same thing" as Mr. Banki himself, implying that at trial, non-government agent witnesses will testify to Mr. Banki's *knowledge* that he was managing or participating in money transfers *to* Iran. (Ex. B, at 19:20-21.) The

---

[2] Only a single page of the Memorandum of Interview , the page containing this excerpt, was produced on January 20, 2010. *See* Ex. H. The full version, with signature of the agent, date the Memorandum was prepared, and sparse handwritten notes apparently made at the time of the interview, was only sent by Fedex to Mr. Banki's counsel on January 22, 2010, the day after the detention order was issued. *See* Ex. J.

Government letter of January 20, 2010, however, abandons this claim; it states that such witnesses will establish only that their money was "being remitted back to Iran," and *not* that Mr. Banki was aware of their intention. (Ex. H.) Moreover, it seems likely that Ali Alaie, who is apparently the "co-conspirator" named in the Indictment, will not appear at trial. The Government has not expressed any intention to call cooperating witnesses, and it has conceded that it does not expect to be able to extradite any purported co-conspirators from Iran. (Ex. B, at 20:4-18.)

32.     Also critical is that the purported "admission" of Mr. Banki appears to be a misunderstanding on the part of the agents. Mr. Banki was describing to the agents that he *received* money in New York and then notified his cousin of receipt, as a means of approving payments to brokers in Iran who had helped move the funds *out* of Iran. In its letter of January 20, 2010, the Government relied on only two phrases of the paragraph quoted above to establish Mr. Banki's knowledge that he was helping to transfer funds from the U.S. *to* Iran: the statement "Alaie would pay out the *recipients* of the money transfer in Iran," and "it was the only way for people to get money *to* Iran." (Ex. H (emphasis added).)

33.     Neither phrase supports the Government's case. As to the first, Mr. Banki never said that he phoned Alaie to have "recipients" of U.S. funds paid in Iran; he was informing Alaie of his own receipt of funds so that *fees* for the U.S.-bound transfer could be paid in Iran. The very idea of a "recipient" of a transfer of funds to

13

Iran makes no sense in the context of the rest of the discussion, which describes that Iran was the origination point of funds sent to New York to be invested by Mr. Banki. As the Memorandum itself states, Mr. Banki was explaining "why the money was deposited *into* his account." (Ex. J, at 3 (emphasis added).) The phrase "it was the only way for people to get money to Iran" has the same defects. What Mr. Banki stated was that there was no other way to get money *out* of Iran. Again, the reading that will apparently be urged by the Government at trial makes far less sense in the context of the remainder of the Memorandum of Interview.

34.     Fatally, the Government can offer no explanation of why, if Mr. Banki were guilty of OFAC violations as the Indictment alleges, he would have ever made the purported "admissions," given his full awareness since 2006 of the existence of OFAC's inquiry. In fact, Mr. Banki has been maintaining steadily since 2006 that he has only received funds from Iran.

**F.     The District Court's January 21, 2010 Order Denying Bail**

35.     On January 21, 2010, the District Judge issued the Order rejecting Mr. Banki's request for bail pending trial. The District Court did not make any express finding on risk of flight. It found that there were "no conditions or combination of conditions which will reasonably insure the attendance of the defendant at trial if he is released on bail." (Ex. I, 1/21/10 Order, at 1.)

36.     The Order began by stating that "[a]ccording to the Government, the

14

evidence against the defendant is strong" (*id.* at 1-2.), but did not otherwise discuss the strength of the case. The Order noted that Mr. Banki faced a "considerable period of incarceration" if convicted, from 63 to 78 months' imprisonment. (*Id.* at 2.)

37. Judge Keenan characterized the "community ties" of Mr. Banki as "weak." (*Id.*) The District Judge noted that Mr. Banki, "a native of Teheran, Iran," was single and that his relatives resided in Iran. (*Id.*) The Court acknowledged Mr. Banki's U.S. citizenship since 1996, but did not discuss his long-time residency. (*Id.*) The Order noted that Mr. Banki had traveled to Iran as recently as August 2008 and was "unemployed presently." (*Id.*)

38. The District Court discussed at length the photocopied flyer found at Mr. Banki's apartment. (*Id.* at 3.) The Order quoted a portion of defense counsel's submission in which it had described that the telephone number listed on the flyer no longer rang at any Canadian ID company, but stated: "I do not understand exactly what this [proffer] means." (*Id.*) The Court found that, at a minimum, the flyer proved "that false travel and identification documents are available on the market in Canada and other places." (*Id.*) The Court also affixed the flyer as an Exhibit to its Order and questioned why Mr. Banki would "h[o]ld on to this strange collection of photo identification cards for over ten years." (*Id.* at 3-4.)[3]

39. The District Judge deemed electronic monitoring insufficient to

---

[3]  No actual photo identification cards were ever at issue. Rather, a portion of the photocopied flyer bears images of false forms of identification.

guarantee Mr. Banki's presence at trial because it was "hardly foolproof." (*Id.* at 4.) The District Court also rejected the possibility of a private security force, stating that the arrangement was "not acceptable to this Court, certainly not in this case." (*Id.*)

40.    Judge Keenan deemed "significant" the offers made by Mr. Banki's friends to co-sign a bond, in an amount up to $1 million, but concluded that the bond and co-signers were not "adequate assurance that this single, 33-year old native of Iran will not flee." (*Id.*) The District Judge questioned whether Mr. Banki could validly offer his apartment as security, reasoning that the property was already encumbered by the *lis pendens* notice. (*Id.*)

41.    Finally, the District Court found that the documentation tying Mr. Banki's family to the current opposition movement in Iran and describing the Iranian regime's attempt to take or impair his family's assets "do not really establish anything," especially given that Mr. Banki's mother and brother had returned to Iran as recently as October 2009. (*Id.* at 5.)

42.    On January 29, 2010, Mr. Banki filed a timely Notice of Appeal.

## ARGUMENT

## THE ORDER DENYING BAIL PENDING TRIAL SHOULD BE REVERSED

### A.    The Applicable Standard

43.    When, as here, only risk of flight is at issue, "the law still favors pre-trial release subject to the least restrictive further condition, or combination of conditions, that the court determines will reasonably assure the appearance of the person as

required." *Sabhnani*, 493 F.3d at 75 (internal quotation marks and alterations omitted) (quoting 18 U.S.C. § 3142(c)(1)(B)). "Only if a detention hearing shows that no condition or combination of conditions will reasonably assure the appearance of the person as required shall the court order the detention of the person before trial." *Id.* (internal quotation marks and alterations omitted) (quoting 18 U.S.C. § 3142(e)). "Under this statutory scheme, it is only a limited group of offenders who should be denied bail pending trial." *Id.* (internal quotation marks omitted) (quoting *Shakur*, 817 F.2d at 195).

44.    Because the law favors bail, the government carries a dual burden in seeking pre-trial detention. First, it must establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight. *Id.* (citing *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986)). If it satisfies this burden, the government must then demonstrate that no condition or combination of conditions could be imposed that would reasonably assure the defendant's presence in court. *Id.* (citing *Shakur*, 817 F.2d at 195).

45.    Although this Court ordinarily reviews a district court's order of pre-trial detention for "clear error," *see, e.g.*, *Shakur*, 817 F.2d at 195, it has also explained that whether there are conditions that will assure the appearance of the defendant at trial is more accurately deemed a mixed question of law and fact. *See id.* at 196. In many cases, the lower court's determination "involve[s] purely factual

17

determinations." *Id.* When the District Court's conclusion has been affected by an error of law, however, the review is *de novo*, and the District Court's order "should be set aside." *See id.* at 196-97.

## B. The District Court Erred In Ruling That Mr. Banki Presented A Serious Flight Risk

47.     The District Court erred in ruling that the Government had established that Mr. Banki posed a serious flight risk, for two reasons.

48.     *First*, the District Judge committed legal error in accepting at face value the Government's customary representation that its case was "strong." *See United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (the court "must also ensure the reliability of the [proffered] evidence, by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question."). The District Court's consideration of the matter was undoubtedly undermined by the Government's failure to produce until the eve of the second bail hearing the Memorandum of Interview described above. The Government also badly overclaimed when it initially stated that the non-agent witnesses would establish "the exact same thing" as Mr. Banki's purported admissions of awareness that funds were being sent to Iran. It nonetheless became clear in the course of the District Court's consideration of Mr. Banki's bail application that the case here is far from "strong," as the Government had asserted. The District Judge erred in failing to insist upon a further showing. It wrongly neglected to consider the equivocal nature of the proof,

18

which in turn fatally undermines any notion that fear of conviction will cause Mr. Banki to flee.

49.     Simply put, this is not a case in which records or recordings exist of Mr. Banki ordering money transfers to Iran, such that guilt is clear or any guilty verdict foreordained. Nor will cooperating witnesses testify. Rather, it appears that the non-agent witnesses who will testify at trial will merely describe the hawala system described in the Indictment, and perhaps their own participation in it, without being able to establish that Mr. Banki knowingly managed a service that sent funds *to* Iran. The Government indeed has referred repeatedly to Mr. Banki's "admissions" as the key to proving any criminal conduct.

50.     The extent to which the Government is apparently relying on Mr. Banki's admissions provides strong reason to credit Mr. Banki's vow to fight the charges on the merits. The Government's dependence on Mr. Banki's "admissions" means that the trial necessarily will test the credibility of the ICE agent (or agents). Mr. Banki, the only other party present at the interview, expects to establish that the agents either misunderstood or misconstrued what he said. Mr. Banki has a compelling defense to unfounded charges, and this circumstance knocks away a linchpin of the finding of a serious risk of flight.

51.     *Second*, the District Court's conclusion that Mr. Banki presented a risk of flight was clearly erroneous, given Mr. Banki's considerable ties to the U.S., and the

decisions he has consistently taken, since 2006, to deal with questions about his compliance with OFAC regulations by remaining in the U.S., seeking advice of counsel, and responding to OFAC.

52.     Mr. Banki does not contest, as the District Court Order states, that he is single, that he was born in Iran, that his immediate family now lives in Iran, and that he has been unemployed since his arrest. The same Order does not, however, consider or even describe Mr. Banki's long residence in the U.S. and the course of his education and career here. It refers to the girlfriend with whom he lives only to note that she is not "an adequate incentive to prevent his flight or sufficient reason to grant bail," when the burden properly should be placed on the Government to show that there are affirmative reasons that Mr. Banki would flee. *Sabhnani*, 493 F.3d at 75. This burden-shifting constitutes legal error. *See United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985) (where record left unclear the manner in which district court applied burdens of presumption and persuasion under Bail Reform Act, remand required); *cf. United States v. Guzman*, 318 F.3d 1191, 1198 (10th Cir. 2003) (in sentencing context, shifting burden to defendant constitutes legal error).

53.     The Order entirely disregards that Mr. Banki has been aware of the Government's review of his receipt of funds from Iran since at least 2006, when Mr. Banki first received a letter from OFAC (Ex. A, at 4:3-4.), and that since then Mr. Banki has responded to OFAC's requests for information and reported payments from

Iran on his U.S. tax returns. Even after being pulled aside and interviewed by law enforcement agents while returning from vacation in London last May, Mr. Banki has always returned to the U.S., although he has traveled internationally. Such behavior has consistently been held to weigh in favor of release on bail pending trial. *See United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) (finding clear error in finding of a serious flight risk, where defendant had remained in jurisdiction after agents executed a search warrant at his home three weeks prior to his arrest).

54.     Especially in light of Mr. Banki's continuous presence in the U.S., before and after 2006, the District Court wrongly relied on the sixteen-year old photocopied flyer advertising false forms of identification as a basis for finding risk of flight. The District Court reasoned that even if the flyer advertised a company that no longer existed, "false travel and identification documents are available on the market in Canada and other places." (Ex. I, at 3.) The availability of false travel documents, however, says nothing about Mr. Banki's will to flee. It also does not establish that the means to flee is any more available to Mr. Banki than any other defendant.

55.     The District Court also expressed unease that Mr. Banki "held on to this strange collection of photo identification cards for over ten years." (*Id.*) Mr. Banki's retention of the flyer, however (no actual "photo identification cards" were ever at issue), also is not reasonably interpreted to demonstrate any current intention to flee, unless one reasons that Mr. Banki believes that it would be useful today to have the

name and telephone number of a defunct service for providing false identification.

Again, the District Court's analysis incorrectly shifted the burden to Mr. Banki to

prove that he would not avail himself of a false identification service, when the burden

of proving risk of flight should have remained firmly on the Government. *See*

*Sabhnani*, 493 F.3d at 75.

56.    The Government, in sum, did not meet its burden of demonstrating risk

of flight, and the District Court wrongly strained to conclude otherwise. The Bail

Reform Act contains no presumption, implicit or otherwise, that a foreign-born U.S.

citizen forever bears the burden of establishing his or her disinterest in fleeing, when

the burden of showing a risk of flight properly rests with the Government. Mr. Banki

should not be detained pending trial.

## C.    The District Court Erred In Holding That No Combination Of Conditions Would Reasonably Assure The Defendant's Presence In Court

57.    The District Court also erred in finding that no combination of conditions

would reasonably assure Mr. Banki's presence at trial. The characteristics of Mr.

Banki's case present a *stronger* case for pre-trial release than even the mainstream of

white-collar criminal cases in which bail is routinely granted, under conditions of

release. Here, Mr. Banki had offered to sign a $1 million bond, co-signed by over half

a dozen U.S. citizens who had offered their life savings and real estate as collateral.

(Ex. B, at 9:15-10:25; Ex. D, at 5:1-12.) Mr. Banki also was prepared to post his $2.5

million condominium in New York City, such that the Government will own the

property straightaway if Mr. Banki were to flee.

58.     The District Court's refusal to set any conditions of bail cannot be reconciled with the principle of bail being the rule rather than the exception. *See Sabhnani*, 493 F.3d at 75. Mr. Banki has no criminal record, has engaged in no violence, and has a strong defense to the Indictment. Since learning of the OFAC investigation, Mr. Banki has dealt openly with OFAC and answered its inquiries. He has traveled abroad, including to Iran, and always returned.

59.     Moreover, while Mr. Banki is far less culpable, and faces a much weaker case and far less punishment than Bernard Madoff or Marc Dreier, he was prepared to submit to conditions of bail similar to those imposed in those cases. Judge Keenan committed clear legal error, most notably, in categorically ruling out any bail package involving house-arrest under the supervision of private security guards. (Ex. B, at 23:22-24:3; Ex. D, at 18:18-25; Ex. I, at 4.) The statement contained in the Order that private security guards were "not acceptable to this Court, certainly not in this case" (Ex. I, at 4.), repeated the District Court's avowal at the January 15 bail hearing that reliance on such guards is "not a process that's going to occur *in any of my cases.*" (Ex. D, at 18:24-25 (emphasis added).) This pre-judgment constitutes additional clear error at the very foundation of the detention Order. *See Berrios-Berrios*, 791 F.2d at 251 (court's "failure to explain on the record the extent to which it considered any alternatives to incarceration and, if so, on what basis they were rejected," constituted

error requiring remand); *United States v. Begleiter*, 198 F.3d 235, 1999 U.S. App. LEXIS 22460 (2d Cir. 1999) (unpublished opinion) (remand necessary where court's comments, including "two strikes and [he's] out," established that it had failed to treat presumption of dangerousness as rebuttable).

60.    This Court indeed has expressly approved the use of private security guards as a measure to assure the defendant's appearance at trial. In *Sabhnani*, a case in which a husband and wife were accused of using Indonesian women as forced labor, this Court vacated an pre-trial detention order and remanded the case for consideration of a package of conditions of release proposed by defendants and accepted by the Government during the pendency of the appeal. 493 F.3d at 73. The package included continuous surveillance of defendants' home by on-site private security guards answerable to the court. *Id.* The quality of the Government's proof and the incentive and means to flee were much greater in *Sabhnani* than is present here. *See id.* at 76 (noting that the evidence of guilt was strong and that defendants faced long jail terms and public obloquy). Mr. Banki, in any event, was wrongly disqualified from obtaining even a hearing on the factors specific to his case.

61.    The District Court also wrongly failed to consider that denying pre-trial release would impair Mr. Banki's ability to help prepare his defense. *Cf. Barker v. Wingo*, 407 U.S. 514, 533 (1972) ("[I]f a defendant is locked up [pending trial], he is hindered in his ability to . . . prepare his defense."). In *United States v. Bodmer*, No.

03-947, 2004 U.S. Dist. LEXIS 959 (S.D.N.Y. Jan. 28, 2004), the court granted pre-trial release to a foreign national who faced charges of violating the Foreign Corrupt Practices Act and the Money Laundering Control Act, reasoning that counsel would need regular access to the defendant to review voluminous discovery and understand the "complicated financial transactions" at issue. *Id.* at *8-9.

62.     Here, too, the defense will be compelled to analyze voluminous financial records, including banking records, in order to properly prepare Mr. Banki's case for trial. Mr. Banki's arrest and incarceration, which are themselves wrongful, are also perversely compounding the difficulty of defending his case and clearing his name. The detention order should be vacated.

## CONCLUSION

Mr. Banki has been unjustifiably charged based on the Government's misinterpretation of the facts and wrongly detained because of the failure of the District Court to take into account factors and circumstances critical to a valid determination on pre-trial release. Mr. Banki respectfully requests that this Court reverse the District Court's denial of release pending trial and order him released on any combination of the conditions proposed to the District Court. In the alternative, Mr. Banki requests that this Court vacate the District Court Order and remand for consideration of conditions that would ensure his appearance at trial.

Dated:    New York, New York
          February 2, 2010      Respectfully submitted,

Christine H. Chung
Marc L. Greenwald
Benoit Quarmby
QUINN EMANUEL URQUHART
  OLIVER & HEDGES, LLP
51 Madison Ave., 22nd Floor
New York, New York  10010

*Attorneys for Defendant Mahmoud Reza
Banki*